Collova and another, Appellants, v. Mutual Service Casualty Insurance Company, Respondent.

*November 4—December 1, 1959.*

536

For the appellants there was a brief by *Weisman & Weisman* of Racine, and oral argument by *J. N. Weisman.*

For the respondent there was a brief by *Whaley & Whaley* of Racine, and oral argument by *Vilas H. Whaley* and *John W. Whaley.*

BROADFOOT, J.   It is the contention of the plaintiffs upon this appeal that the damages awarded are grossly inadequate, contrary to the undisputed evidence and the instructions of the court; that the awards were perverse and the result of passion and prejudice; and that furtherance of justice entitles plaintiffs to a new trial. No claim of error in the conduct of the trial, instructions given to the jury, or to the form of the verdict is made.

At the time of the trial in January, 1959, Mrs. Collova was fifty-nine years of age and her husband was sixty-eight. For thirty-eight years Mr. Collova had been employed by a railroad company and during the three years before the trial he had been roundhouse foreman.

Plaintiffs called 12 lay witnesses and four medical witnesses. The defendant called no witnesses but introduced a portion of an adverse examination of Mrs. Collova. By the testimony of their witnesses the plaintiffs sought to convince the jury by the requisite degree of proof that prior to the accident Mrs. Collova was healthy, congenial, with a great capacity for work and play, and with a willingness to work that matched her capacity. They testified to her many activities prior to the accident that involved caring for a large home, including painting both inside and out, and work upon the farm; that she was active in church work, and that at frequent family gatherings she played baseball, pitched horseshoes, and engaged in other activities with the family.

Mrs. Collova testified that she had been in constant pain since the accident; that her right side is numb; that she cannot hear well with her right ear; that she cannot sleep, and that she is unable to do the many things she was capable of doing before. Other witnesses testified that her personality had changed; that she had become despondent; that she had constant pain; that she could not do the things she had been accustomed to doing before the accident. There was medical testimony as to her constant pain, some loss of hearing in the right ear, and some loss of sensation in her right side. In the opinion of one or more of the medical witnesses she had suffered a cerebral concussion and a whiplash injury at the time of the accident. Also, that the injury had aggravated a congenital abnormality of the bones of the neck, so that prior to the accident some of the neck bones were fused or fastened together. They were arranged in a shortened fashion so that the skull came down over them.

Although the plaintiff testified that she was in great pain she refused to follow the advice of the officers and go to a hospital and she also refused to ride to her home in the ambulance that was present. The accident happened on a Friday night but she did not go to a doctor's office until Monday morning. Some of the extracts from the adverse examination of Mrs. Collova that were read to the jury by the attorney for the defendant are as follows:

" 'Q. What hospital were you taken to? A. Don't talk about hospitals. I wouldn't go.

" 'Q. You wouldn't go to the hospital? A. No, sir. They come with the ambulance and the officers wanted to help me in the ambulance and I told them I wasn't going because I felt I didn't have no broken bones and I didn't know but I wouldn't go and I didn't like that and I said take me home and he said, "Well, you better go in the ambulance," and I said "No, I am not going." ' "

" 'Q. Did you have a doctor after this accident? A. Oh yes, sir. Madden. I went to see Dr. Madden.

" 'Q. Is he still your doctor? A. No, sir, they sent me to all kinds.

" 'Q. You have been to different doctors, have you? A. Yes.

" 'Q. How long was Dr. Madden your doctor? A. About a month, I think.

" 'Q. And you didn't go to the hospital at all? A. No, I wouldn't go.

" 'Q. They just took you home? A. Yes, they helped me to the door.

" 'Q. What other doctors have you had since Dr. Madden? A. Dr. Madden, Dr. Minton, Dr. Charles Christenson, Dr. Harris, Dr. Maxwell, Dr. Millen. . . .

" 'Q. Who is your doctor now? A. Minton.

" 'Q. Dr. Minton? A. Yes, sir. I went back to him.

" 'Q. Is he a heart specialist? A. No, he is a medicine— see, I had so many and they don't know nothing.' "

Some of the doctors she consulted recommended hospitalization for a more-thorough examination and she declined to follow this and other medical advice given to her, none of which involved any hazard to her. She testified that one of the doctors advised an operation which would cost $6,000 or $7,000. The doctor, who was one of her medical witnesses, denied giving her such advice.

No injured person is required to undergo surgery or treatment that is hazardous or unduly expensive but one injured by the wrong of another is obliged to exercise reasonable care to minimize damages. This obligation includes the seeking of medical care as well as the following of the advice of the physician consulted in order to alleviate the injury. The general rule and the exceptions thereto are found in an annotation in 48 A. L. R. (2d) 346. The trial court gave an instruction to that general effect.

In most personal-injury cases that reach us on appeal where an insurance company is a defendant, the claim is that damages are excessive. A recent case is *Sennott v.*

*Seeber,* 6 Wis. (2d) 590, 95 N. W. (2d) 269, wherein we quoted from *Bethke v. Duwe,* 256 Wis. 378, 41 N. W. (2d) 277, and we there stated in effect that a verdict may not be set aside as excessive on appeal unless there is an indication that the award was the result of passion, prejudice, corruption, or a disregard of the evidence or the rules of law. The same rule applies when there is a claim of inadequate damages. We have searched the record and find nothing therein that would warrant any inference that the jury was improperly influenced or that its verdict evinced passion, prejudice, or partiality, or that the jury disregarded the evidence or the rules of law. It is fundamental that the credibility of the witnesses and the weight to be given to their testimony are for the jury.

In motions after verdict the same arguments that are presented to us were made to the trial court. The verdict received the approval of the trial court, and judgment was entered thereon. Upon the record and in view of the trial court's determination, we can find no adequate ground for the granting of a new trial.

*By the Court.*—Judgment affirmed.