Bruce LOBERMEIER, Plaintiff-Respondent-Petitioner,

v.

GENERAL TELEPHONE COMPANY OF WISCONSIN, a domestic corporation, and American Motorists Insurance Company, a foreign insurance corporation, Defendants-Appellants.†

Supreme Court

*No. 82-240. Argued February 28, 1984.—Decided June 13, 1984.*

(Also reported in 349 N.W.2d 466.)

† Motion for reconsideration dismissed August 14, 1984.

130

For the plaintiff-respondent-petitioner there was a brief (in court of appeals) by *DeBardeleben & Snyder*, Park Falls, and oral argument by *Arthur DeBardeleben*.

For the defendants-appellants there were briefs (in court of appeals) by *Thomas Terwilliger* and *Terwilliger, Wakeen, Piehler, Conway & Klingberg, S.C.*, Wausau, and oral argument by *Thomas Terwilliger*.

HEFFERNAN, C.J.   This is a review of an unpublished court of appeals decision dated April 19, 1983, which reversed a judgment of the circuit court for Price county, William E. Chase, Circuit Judge, which, following a jury verdict, ordered plaintiff Lobermeier to recover damages for injuries to his hearing when, according to the verdict, an improperly grounded telephone he was

using conducted an electrical charge caused by lightning to the telephone receiver, singeing his hair and rupturing his eardrum.

The court of appeals reversed on all issues. We reverse that decision in part, because we do not agree with the court of appeals decision to order a new trial on the question of liability. In that respect, we would affirm the circuit court. We agree, however, that the trial court improperly decided the question of mitigation of damages as a matter of law. We conclude that the question was one of reasonableness under the circumstances, a question for the jury. Accordingly, we affirm the court of appeals in that respect and reverse the trial court.

We remand the cause to the circuit court for a retrial on the question of damages only.

To review the facts leading to this litigation:

On July 19, 1976, the plaintiff sustained a ruptured eardrum, with a resulting hearing loss, while talking on a telephone in his parents' home. The phone was installed and maintained by the defendant, General Telephone Company of Wisconsin. The plaintiff was treated for the injury by Doctors Ruben T. Aguas and Gurdon Hamilton. The doctors determined that the plaintiff sustained a traumatic tympanic membrane perforation of the left ear caused by a lightning-induced electrical charge. For the first four months after the injury, the doctors prescribed a conservative treatment of antibiotics and ear drops. On October 28, 1976, Dr. Aguas felt the tympanic membrane was not going to heal spontaneously and recommended the plaintiff have surgery on the left ear.

On November 24, 1976, Dr. Aguas performed a tympanoplasty of the left ear, which involved the grafting of a substitute membrane over the eardrum. Doctor Aguas last saw the plaintiff on June 27, 1977. The

plaintiff's subsequent treating doctor, Dr. Richard L. Dobbs, first saw him on February 6, 1979, at which time the plaintiff complained of a hearing loss in the left ear since July of 1976 and of ringing in the ear. After examining the plaintiff, Dr. Dobbs concluded, to a reasonable degree of medical certainty, that the graft done in November of 1976 had lateralized, there was severe conductive hearing loss in the left ear, and there was a possibility of a cholesteatoma. A cholesteatoma is disquamated skin and tissue which collected behind the eardrum. It is a potentially threatening disease because, as it slowly enlarges, it erodes into the inner ear and may cause vertigo or deafness, or may erode the covering of the brain and cause a brain abscess, or may erode into the facial nerve canal and cause a facial paralysis.

On June 7, 1979, the plaintiff filed a complaint alleging the defendant was negligent in that the telephone system on the Lobermeier premises was inadequately grounded and that, while the plaintiff was using the telephone service, he suffered a severe shock of atmospheric electricity conducted by the telephone lines to the telephone handset into the left ear and through the eardrum, causing the plaintiff's injuries. In its answer of July 3, 1979, the defendant denied negligence in failing to ground adequately the telephone or to maintain adequately such telephone service and raised, as one of its affirmative defenses, that the plaintiff failed to mitigate his damages.

A jury trial commenced on September 16, 1981, and concluded on September 25, 1981. At the outset of the trial the defendant denied negligence; but on the third day of trial, the defendant admitted it was negligent in not properly grounding the telephone system at the Lobermeier residence in accordance with its own regulations and the requirements of the Wisconsin Admin-

istrative Code and the National Electrical Code. Consequently, the issue of liability that remained in dispute was whether the defendant's admitted negligence caused the injuries sustained by the plaintiff.

The theory under which the plaintiff proceeded at trial was that lightning struck the telephone company's transmission system and the electrical current traveled along the telephone wires until it came to an improperly grounded telephone, which allowed the electrical current to flow in the telephone earpiece, which in turn caused the plaintiff to suffer a ruptured eardrum. Thus, under the plaintiff's theory, the improper grounding of the telephone system caused the plaintiff's injury.

The defendant's theory was that lightning struck the Lobermeier's T.V. antenna, located on top of the house, and the electrical current flowed along the antenna wires to the television set, located in the living room, which resulted in a side-flash of electricity from the television set into the kitchen, to the receiver, and to the plaintiff's ear, a distance conceded to be over 20 feet. Under the defendant's theory, the improperly grounded telephone system was not a cause of the plaintiff's injuries, because the electricity from the lightning was transmitted by the television antenna and television set, not by the telephone line.

The plaintiff-respondent asserts in this court that the defendant telephone company waived any right on appeal to complain of any error or abuse of discretion in the course of the trial, because it had a mistrial "handed to it" as a matter of right when, on the fourth day of trial, one of the jurors became ill and, instead of taking a mistrial, waived a 12-person jury and elected to proceed with 11, when it could, without question, have terminated the trial at that point. Several errors asserted by the telephone company on appeal and on this review were committed prior to the juror's illness. To these

errors, proper contemporaneous objection was made, and in respect to each of them a motion for mistrial was made and denied. When the problem of the absent juror was posed at the beginning of the fourth day of trial, the defendant agreed to waive the 12-person jury on the condition that the plaintiff waive his claim for punitive damages.

The law is clear that the event—the absence of a juror—was cause for a mistrial. The parties may stipulate, however, to go on with the trial with less than a numerically complete jury. *State ex rel. Polk v. Johnson,* 47 Wis. 2d 207, 177 N.W.2d 122 (1970); *Frion v. Craig,* 274 Wis. 550, 554, 80 N.W.2d 808 (1957).

Having had, at this juncture, the absolute right to a mistrial, the telephone company, the plaintiff claims, obviously evidenced a willingness to rely on a favorable jury verdict and to forego any previous claims of error. This assertion of the plaintiff is not without logical foundation, for the entire basis of the mistrial-demand rule is predicated on the philosophy that a litigant "cannot have its cake and eat it too." In other words, if a litigant has raised a claim of error of so serious a nature that it may warrant a mistrial, the litigant must not only claim error but must demand the mistrial, for to fail to demand a mistrial is tantamount to an acknowledgment that the error is harmless, or at least it is not prejudicial to the degree that the aggrieved party is not willing to proceed on the assumption, or hope, there will be a favorable verdict despite the error.

The record indicates that the defendant and the plaintiff entered into a bargain at this point. The defendant agreed to waive its objection to the jury if the plaintiff waived its claim for punitive damages. Apparently, the plaintiff was anxious to proceed with the trial, for on the third day it had received an explicit concession that the telephone company was negligent in failing to ground

the telephone line properly. Also it had been the recipient of numerous favorable rulings by the trial court in respect to further surgery, evidence of the consequences of improperly grounded telephone systems, and evidence of the "offer" of a scholarship.

It is thus rather apparent, because the "deal" was arguably beneficial to both parties, that the assumption was that the record was to be treated as protecting all the rights, benefits, and objections that had appeared or had been developed in the record to that time. It must be remembered that the plaintiff, too, could have asked for a mistrial, but chose not to, because it had, as is apparent from the record, made substantial progress in proving its case. Because of the expense to a plaintiff in bringing a new lawsuit following a mistrial, a demand made by a defendant can be accompanied by an agreement on conditions for a waiver that are economically coercive and unfair to a plaintiff. Here, however, both parties benefitted, or thought they stood to benefit, by proceeding in the absence of the 12th juror.

Moreover, their agreement was explicit, and upon the record the defendant stated:

"Your Honor, we are not waiving in reserving our rights to continue with our previous request for a mistrial on the basis of the previous rulings by this Court and we would reserve that right as well. . . .

"Your Honor, so it's clear, in addition to the other errors that may or may not have occurred in the trial, we're reserving our right in all those areas."

To this, the court responded, "Alright."

Thus, there was an agreement in respect to the scope of the waiver—that all that was being waived was the right to a full, 12-person jury. This was a bargain in which the plaintiff clearly acquiesced, and the bargain was given the imprimatur of the trial court. At the end of the trial, before the return of the verdict, the

defendant renewed his motion for mistrial, including those based on alleged errors that occurred prior to the illness of the 12th juror. It was thus made apparent to the plaintiff before the case went to the jury that no errors, no grounds for mistrial, were waived because of the agreement entered into on the fourth day. Here, the plaintiff was fully aware of what was transpiring and was informed of the effect of his bargain. By entering into the bargain, counsel for the plaintiff retained all the progress made in the trial to date and forewent only a speculative claim—at that juncture at least—for punitive damages. Both parties benefitted by the bargain.

Clearly, the defendant did not waive its right to appeal from the adverse judgment of the trial court. Its claim of error may be heard and considered by this court.

While the defendant conceded that it was negligent in its failure to ground the telephone line, it did not concede that such negligence caused Lobermeier's injury.

The proof, and disproof, of cause involved evidence in respect to the distortion of an aluminum disk, which was a part of the earpiece of the telephone. The disk is normally flat; but, upon disassembly following the incident, it was found to be distorted into a concave configuration, *i.e.*, as viewed from the face of the earpiece, the disk was bent downward. This, the defendant theorized, supported its theory that the electrical impulse must have had its origin external to the telephone —that it was an acoustical side-flash from the television set.

We will not review the evidence for sufficiency, because that has been done by the court of appeals. Under the state of the record, there was evidence upon which

a reasonable jury could have found that the electrical impulse originated in the telephone or was transmitted by it. In fact, the telephone company's brief filed in the court of appeals does not attack the sufficiency of the evidence to support the plaintiff's claim of causality. Rather, the claim is one of abuse of discretion that the evidence proffered to the jury was submitted without the defendant having an opportunity for surrebuttal of plaintiff's witness. The court of appeals accepted the argument of the telephone company, contending that the trial judge abused his discretion in refusing to allow surrebuttal. We conclude that there was no abuse of discretion and that the proffered surrebuttal was properly denied. Additionally, even if defendant's theory of abuse of discretion were accepted, the evidence which would have been offered was cumulative in nature and would have added nothing to the defendant's case. In short, its exclusion at best would constitute harmless error.

On direct examination, Dr. Theodore Bernstein, expert witness for the plaintiff and an acknowledged authority on lightning and its effect on telephone systems, testified that the injuries sustained by Lobermeier were caused by high voltage and not by an acoustical shock. On cross-examination of Dr. Bernstein by defendant's counsel, the distortion of the aluminum disk in the earpiece was brought up for the first time and posed in a hypothetical form when defense counsel asked what would cause a flat shaped object to become concave. To this, Dr. Bernstein replied:

"[I]f you have this device that starts off flat and ends up concave, like that, then there must have been some kind of force either acting at the center or at the ends pulling one direction or the other."

On redirect, Dr. Bernstein stated that there were many things that could cause the bending of the disk but an

explanation for the bending does nothing to explain the dynamics of what caused the plaintiff's injuries.

The defense offered Kenneth Helfrecht, an engineer employed by General Telephone Company of Illinois, who testified that the flat disk was "plain pushed in." That fact and the presence of copper "beads" in the phone indicated to Helfrecht that the electrical charge entered at the phone, traveled down the wiring, and to the outside. He stated his belief that an acoustical force had caused the plaintiff's injuries. He also defined an "eddy current" but did not relate it to the injuries sustained by Lobermeier or to the shape of the aluminum disk.

The defendant called Professor Szews of Marquette University, a professor of electrical engineering. Professor Szews stated his doctoral thesis dealt with magnetic currents, but he did not associate this with the aluminum disk. He testified on direct that the "only" explanation of the distortion of the metal plate was an acoustical shock. On cross-examination, he reiterated that there was no other explanation. He also defined and explained an eddy current; and because he specifically said that the distortion of the aluminum disk could only occur from an acoustical shock, he effectively stated that no other force, including eddy currents, could have distorted the disk.

Doctor Bernstein was called in rebuttal, and it is the claim of the defendant that his testimony introduced new facts or new matters that warranted a surrebuttal. We conclude from our examination of the record that he introduced no new facts and no new matter. He stated there was no simple cause that alone could explain the distortion and it could have been caused by a magnetic field, an electrostatic force, eddy currents, or acoustical shock, all of which possibilities had been alluded to before.

He stated that the evidence was meaningless in respect to the direction of the surge of power and also stated

that the theory of Helfrecht and Szews that how the electricity went into the telephone (from a television set in another room) was "fantastic, it makes no technical sense."

All of the phenomena mentioned as possible causes by Dr. Bernstein had been referred to in earlier testimony. Certainly, "eddy currents" had been specifically referred to in the testimony of Professor Szews, but he chose to state that the "only" possible cause for the injury to Lobermeier was an acoustical shock. Yet, the defendant's offer of proof asserted that surrebuttal was desired in order to call on Professor Szews, who would state that an eddy current does not have a significant effect on a nonferrous metal like aluminum and could not account for the distortion. Dr. Bernstein never asserted it did.

While the defense counsel might have wished to have his witness given the opportunity to testify once again, he had already said what he now offered to prove—that an eddy current (or any other phenomenon) could not have the physical effect on the disk, only an acoustical shock could have caused the distortion of the aluminum earpiece.

The trial court correctly held that there should be no surrebuttal, because no new matter was brought up on rebuttal by Dr. Bernstein. After the offer of proof, surrebuttal was again ruled out by the trial court, which stated:

"It is not new evidence, this was brought up in your case in chief, your witnesses all said this was impossible to happen, these eddy currents were brought up, these other things were brought up, your theory of the case is completely before the jury."

We conclude that the court of appeals erred in its review of the evidence. It overlooked the fact, clear in the record, that the defense experts had ruled out *all* causes

other than acoustical shock. We also conclude that the court of appeals applied an improper standard of review or, if it did apply the proper standard, it failed to articulate it. The correct standard is whether the trial court abused its discretion.

That standard is stated in *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 193 F.2d 162, 166–67 (1st Cir. 1952), *aff'd* 344 U.S. 228 (1952) :

"The permissible range of testimony offered in rejoinder, or surrebuttal, as it is sometimes called, is to a large extent discretionary with the trial court. Ordinarily at that late stage in a trial only evidence to explain away new facts brought forward by the proponent in rebuttal, or evidence to impeach witnesses who testified in rebuttal, is properly admissible. Otherwise orderly presentation, and hence clarity, would bow to the convenience, or even whim, of counsel, and afterthoughts, with consequent confusion, would be encouraged at the expense of thorough preparation by counsel in advance of trial."

*See,* also, *McGowan v. Chicago & Northwestern R. Co.*, 91 Wis. 147, 153, 64 N.W. 891 (1895) ; *Campbell v. Moore*, 3 Wis. 673, *767 (1854) ; *Rausch v. Buisse*, 33 Wis. 2d 154, 167, 146 N.W.2d 801 (1966).

In any event, surrebuttal is appropriate only when in the judge's discretion a new matter or new facts are injected for the first time in rebuttal. *Karl v. Employers Insurance of Wausau*, 78 Wis. 2d 284, 254 N.W.2d 255 (1977) ; *Rausch v. Buisse, supra* at 167.

In accordance with the rules that govern the exercise of discretion, the trial judge stated the facts as they appeared of record—that no new facts or matters were injected into the case by Dr. Bernstein's rebuttal testimony. He also stated that, in any event, the defendant was not harmed because its case—its theory—was fully before the jury.

██
We conclude that the court of appeals erred when it reviewed the trial judge's determination to exclude rebuttal, because it did not look to the question in light of the trial court's duty to exercise its discretion reasonably in light of the circumstances and the facts of record.

██
We also agree with the trial judge's conclusion that the defendant was not harmed, for it had put its whole case before the jury. In retrospect, then, had there been an abuse of discretion, it was harmless, because the defendant's case was put before the trier of fact in an adequate manner. The further statement of Professor Szews could have delayed completion of the trial, added a little more confusion, and resulted in the layering of cumulative evidence, but could not conceivably have affected the result. Professor Szews had already stated, "acoustic shock" *only* could have caused the injury.

The trial court erred, however, when it ruled, as a matter of law, that the defendant had no duty to mitigate damages by undergoing a second ear operation. We agree with the conclusion of the court of appeals that it was a matter of fact to be determined by the jury whether a reasonable person under the circumstances would submit to a second surgical procedure. Because it appears that this conclusion, reached as a matter of law by the trial judge, that the defendant's damages were not to be reduced by reason of his refusal to submit to surgery had a substantial impact upon the award of damages, a new trial upon the question of damages is necessary.

The facts show that, upon objection by plaintiff, the court refused to permit a physician, hired by the telephone company, to examine the defendant and to testify in respect to the damage to the plaintiff if second sur-

gery were not performed and the improvement in hearing that probably would result if further surgical procedures were undertaken. The court also held that the deposition of Lobermeier's treating physician could not be produced either in respect to risks for or against future surgery. The court stated:

"[I]n all fairness that a person who is injured, if there is a risk of either further harm or death, that decision should be left up to him without penalty."

The court concluded that, once it reached the conclusion based on the reasoning above that a second operation was not required, the jury had nothing to weigh in respect to further mitigation of damages by reason of not having further surgery.

It instructed the jury, "[P]laintiff's damages are not to be diminished because he did not have a second operation." Because of this instruction, the defendant objected and moved for a mistrial. The balance of the instruction included the usual admonitions in respect to mitigation of damages:

"[D]uty of plaintiff to exercise ordinary care to mitigate his damages and if you find that he did not do so, you should not include in your answer to this question any amount for consequences of his injuries which could have been averted by the exercise of such care."

The court also instructed that, in fixing damages, the jury could consider Lobermeier's failure to use a hearing aid.

The general instruction of the trial court in respect to the duty to mitigate damages was correct. Its specific ruling as a matter of law that there was no duty to submit to a second operation was not.

The duty to mitigate damages has long been standard personal injury law. McCormick, *Damages* (hornbook series, 1935), sec. 36, p. 136, states as a matter of black letter law:

"Any suffering or disability incurred by one who has sustained personal injury, when the same could have been avoided by submitting to treatment by a physician selected with reasonable care, must be excluded as a ground of recovery. It is held, however, that the victim may use his own judgment about submitting to a dangerous or serious operation."

McCormick goes on to explain that:

"If the operation is simple and not dangerous, a failure to submit when advised to do so will be deemed unreasonable." *Id.* at 137.

Nevertheless, at the time McCormick wrote, 1935, there was a considerable body of law supportive of the trial judge here that held that:

"[A] 'major,' 'dangerous,' or 'serious' operation, especially where the results are 'problematical,' involves so critical a choice between the danger of the operation and the danger of the injury . . . that most courts seem to hold as a matter of law that a refusal to undergo such a danger is not ground for reducing damages." *Id.* at 137.

McCormick then went on to note that, as surgical science progresses and becomes more predictable, reasonable conduct in the future may require that the advice of physicians be followed even in respect to serious operations.

We conclude that Wisconsin law has set its course midway between these two extremes. The question is one of fact for the jury—what was a reasonable course of conduct, under the circumstances, to mitigate the injuries or damages.

In *Loser v. Libal*, 269 Wis. 418, 424, 69 N.W.2d 463 (1955), we affirmed the jury's use of an instruction where it was called upon to determine whether the award for plaintiff's damages was excessive because the jury did not follow the instruction:

" 'Now you are further instructed that it became the duty of plaintiff when he was injured in the collision, to exercise ordinary care to mitigate or lessen his damages; and he is still under such duty. By "ordinary care" as that term is here used is meant the care ordinarily exercised by the great mass or majority of mankind or its type, the ordinarily prudent person, under the same or similar circumstances. The duty to mitigate damages on the part of an injured person imposes the duty to submit to and undergo such surgical or medical treatment within a reasonable time as will probably improve his condition and is reasonably within his means. In fixing damages you will keep in mind this duty of plaintiff to exercise ordinary care to mitigate his damages.' "

We held that the jury had not disregarded the instruction, because the record showed that, even with the surgery, the disability would remain. The correctness of the instruction was not disputed.

A few years later in *Collova v. Mutual Service Ins. Co.*, 8 Wis. 2d 535, 99 N.W.2d 740 (1959), the jury verdict for damages was upheld in face of a claim it was excessive, despite the fact the injured party refused to stay in the hospital as recommended and declined to follow other medical advice.

Despite evidence referred to above, this court on appeal found the damages reasonable but stated the rule then (1959) to be:

"No injured person is required to undergo surgery or treatment that is hazardous or unduly expensive but one injured by the wrong of another is obliged to exercise reasonable care to minimize damages. This obligation includes the seeking of medical care as well as the following of the advice of the physician consulted in order to alleviate the injury. The general rule and the exceptions thereto are found in an annotation in 48 A.L.R. (2d) 346. The trial court gave an instruction to that general effect." *Collova, supra* at 539.

The annotation referred to made it clear there was a duty to seek a cure which does not involve a substantial

hazard of death or injury or is an unduly painful treatment. Nor is a person required to undergo treatment that only offers a possibility of a cure.

*Powers v. Allstate Ins. Co.,* 10 Wis. 2d 78, 102 N.W.2d 393 (1960)—famous for the statement of the "Powers" rule—involved a knee injury. The jury awarded $5,000, despite the fact that there was medical testimony that routine operations could repair the torn cartilege and result in a good functioning knee. The court stated, "There is no legal requirement that the plaintiff undergo such an operation in order to minimize her damages." *Id.* at 87. But the court then went on to state that there was not sufficient evidence to support the $5,000 award *if* the plaintiff were in the future to undergo the knee surgery. *Powers* appears to be an ambiguous ruling in respect to the duty to undergo surgery as a part of the obligation to mitigate damages.

We deem that the modern Wisconsin rule has been stated in *Casimere v. Herman,* 28 Wis. 2d 437, 137 N.W. 2d 73 (1965), and *Hargrove v. Peterson,* 65 Wis. 2d 118, 221 N.W.2d 875 (1974). In *Casimere,* at 447, we pointed out that an injured party is not required to submit to unreasonably dangerous surgery or to submit to any kind of care, but "the proper period of time for which damages or future pain and suffering or other disability are awarded cannot be in excess of that *reasonably* required to effect a cure." (Emphasis supplied.)

In *Hargrove,* at 123–24, we approved the following jury instruction:

" 'Wis J I—Civil, Part II, 1930, Duty to Mitigate
" 'You are further instructed that it became the duty of the plaintiff when he was injured in the collision to exercise ordinary care to mitigate, or lessen, his damages, and he is still under such duty. By ordinary care, as that term is here used, is meant the care usually exercised by a person of ordinary intelligence and prudence, under the same or similar circumstances. The obligation

to mitigate damages imposes the duty of exercising ordinary care to seek medical or surgical treatment and to exercise such ordinary care to submit to and undergo such recommended surgical or medical treatment within a reasonable time, as will probably improve his condition, and is not hazardous and is reasonably within his means. In fixing damages you will keep in mind this duty of plaintiff to exercise ordinary care to mitigate his damages; and, if you find that he will not do so, you should not include in your answer to this question any amount for consequences of his injuries which could have been averted by the exercise of such care.' "

The court concluded that the duty to mitigate instruction was appropriate when the situation presented involved future surgery or future medical treatment. The *Hargrove* court also held that the standard as to reasonableness required of injured parties is "the adult standard as to what is reasonable in the acceptance or rejection of *elective* surgery to mitigate damages." (Emphasis supplied.) *Hargrove*, 65 Wis. 2d at 126.

Failure to mitigate damages is an affirmative defense which must be raised by the defendant in its answer. *Byrnes v. Metz*, 53 Wis. 2d 627, 632, 193 N.W.2d 675 (1972); *Peeples v. Sargent*, 77 Wis. 2d 612, 631, 253 N.W.2d 459 (1977). When the defense is properly raised, the burden of proving failure to mitigate is upon the party asserting it. *Kuhlman, Inc. v. G. Heileman Brewing Co., Inc.*, 83 Wis. 2d 749, 752, 266 N.W.2d 382 (1978). If the defendant asserts failure to mitigate on the part of the injured party, he must prove that a person of ordinary intelligence and prudence under the same or similar circumstances would have elected to undergo the recommended medical procedure. If the defendant meets the burden of proof, the consequence of the injured party's failure to mitigate damages is that the fact finder will not allow damages for those consequences of

the injury which the plaintiff could have avoided by the exercise of ordinary care.

To summarize Wisconsin law on mitigation of damages in tort actions: An injured party is obligated to exercise that care usually exercised by a person of ordinary intelligence and prudence, under the same or similar circumstances; to seek medical or surgical treatment; and to submit to and undergo recommended surgical or medical treatment, within a reasonable time, which is not hazardous and is reasonably within his means, to minimize his damages. The injured party is not *required* to submit to surgery or medical treatment but is only required to submit to those treatments to which the "reasonable person" would have submitted. Although the injured party is not required to undergo recommended treatment, a tortfeasor is not expected to pay for disability or pain if medical treatment could reasonably correct the ailment. The proper period for which damages are allowed is only for the length of time reasonably required to effect a cure.

In the instant case, the defendant attempted to assume the burden of proving that the plaintiff, if acting reasonably under the circumstances, would have followed the advice of physicians and undergone the elective surgery. The trial court erred when it refused to allow the question to go to the jury, rejected evidence on the point, and ruled as a matter of law that the plaintiff's damages were not to be diminished for the failure to have surgery. The trial judge erroneously excluded surgery from the general rule, stating that an injured person was required to seek treatment that was not hazardous, would probably improve the condition, and was within his means.

The defendant was denied a full jury trial on the question of damages. Accordingly, the cause must be remanded for retrial on damages, pursuant to the rule of *Casimere v. Herman* and *Hargrove v. Peterson, supra.*

■

The defendant also objects to the fact that plaintiff was allowed to testify in respect to ten incidents involving personal injuries as the result of improperly grounded telephones. That issue was not reached by the court of appeals. We conclude that the evidence, in the discretion of the trial judge, was properly admitted. The lack of adequate grounding was admitted by General Telephone Company. Hence, other instances of similar negligence and the resultant injuries as the consequence of such negligence are of such similarity that their admission is appropriate.

This court stated in *Netzel v. State Sand & Gravel Co.,* 51 Wis. 2d 1, 9, 186 N.W.2d 258 (1971), that:

" 'Evidence of other accidents or similar occurrences at the same place or under similar conditions and circumstances may be admissible to show the probability of the defect in question, that the injury was caused by the defect and that the person responsible knew or should have known of the existence of the defect.' " Citing with approval, 1 Jones, *Evidence* (5th ed.), sec. 185, p. 324.

As the plaintiff points out, the similarity between the ten accidents and the facts of the instant case is obvious. All ten phones were improperly grounded and hit by lightning, which resulted in injury to the user of the phone. All of the phone installations were those of General Telephone Company. The general rule is that prior accidents are admissible as evidence in the discretion of the trial judge. *Netzel, supra* at 10, n. 18; *Callan v. Peters Construction Co.,* 94 Wis. 2d 225, 231–32, 288 N.W.2d 146 (1979). When the prior incident is of little

probative value, the trial judge, in his discretion, may refuse to admit such evidence.

"Both the purpose for which the evidence of other injuries similarly caused and the nature of the negligence claimed are to be considered in determining whether discretion has been abused." *Callan, supra* at 232.

The evidence in this case was properly admitted under sec. 904.06 (2), Stats., which provides:

"METHOD OF PROOF. Habit or routine practice may be proved by testimony in the form of an opinion or by specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine."

While the evidence was harmful to the defendant, that in general was the obvious purpose of the plaintiff's case. Moreover, it was highly relevant on the issues involved in the instant case: Negligence, which was ultimately conceded, and cause of the injury, in respect to which it was highly probative.

The trial judge properly admitted the testimony in respect to particular incidents of personal injuries by reason of negligently grounding home telephone systems.

It is also contended that the trial judge erred when he instructed the jury on the loss of the plaintiff's chance to pursue a career as a broadcast journalist. It is the plaintiff's contention that his loss of hearing has prevented him from pursuing that career. Evidence was introduced to show the difference to be expected in the earnings of a journalist and that of a mortician (after the accident Lobermeier graduated from the University of Minnesota with a degree in mortuary science). The trial judge instructed:

"If there is any substantial possibility of the plaintiff's realization of his goals and the defendant destroyed that possibility by causing injury to the plaintiff, the

plaintiff is entitled to compensation from the defendants."

The court of appeals correctly concluded that the instruction was erroneous, because it did not require the plaintiff to prove his damages with reasonable certainty. Here there was no evidence to any reasonable certainty of a possible career in broadcast journalism. The question of the loss of earning capacity between the two professions was never reached because there was no reason to conclude that the career of a journalist was reasonably certain. It was completely speculative.[1] We pointed out in *McCrossen v. Nekoosa Edwards Paper Co.*, 59 Wis. 2d 245, 261–62, 208 N.W.2d 148 (1973), that, when future loss of earnings are being considered, we can only deal with probabilities and not certainties. In the instant case, the trial judge went beyond that liberal rule and instructed on a standard of "possibility." As the court of appeals correctly noted:

"The mere possibility of a future occurrence cannot support a damage award. *Kincannon v. National Indemnity Co.*, 5 Wis. 2d 231, 238, 92 N.W.2d 884, 888 (1958)." Slip op. at 9.

We also point out that the "loss of chance" instruction, in addition to being defective, as stated above, was also duplicative of the loss-of-earning-capacity instruction, also given, which properly advised the jury to take into consideration the loss of earning capacity which was the natural consequence of the injury. The trial court thus instructed on an element of damages, loss of chance, which, to the extent it could be shown by a rea-

---

[1] We do not say that the amount of damages are never allowable unless they can be proved to a reasonable certainty. *See, Cutler Cranberry Co. v. Oakdale Elec. Cooperative*, 78 Wis. 2d 222, 233, 254 N.W.2d 234 (1977). Here, damages on the ground asserted were wholly speculative.

sonable probability, was encompassed in the loss-of-future-earning-capacity instruction.

The jury, however, did not at the initial trial find any loss of future earning capacity. Hence, in the context of the trial already had, the lost chance instruction caused no harm. It should not be given a retrial in the form used in the original trial.

Other errors have also been alleged. Because they are unlikely to recur at a retrial, we do not treat them extensively. We conclude that the trial court did not err when it refused to give an instruction stating that, because of plaintiff's failure to make a proper demand for inspection, the telephone company had no duty to produce the telephone for viewing. The trial judge concluded that whatever dispute the parties had in respect to inspection had not affected the jury. In light of the facts, the trial judge properly exercised his discretion to refuse the instruction. The matter will not be likely to recur at trial, for we affirm the jury's finding of liability.

There were also routine objections to the admission of hearsay evidence—all in respect to damages. Because we are remanding for a new trial on the question of damages, the claimed error in respect to admission of hearsay at the first trial becomes moot. Whether error was committed or not, we do not explore further. If error there was, there is no reason why any error in routine hearsay rulings should recur at a retrial.

The court of appeals reversed the trial court and ordered a new trial on all issues. We affirm that portion of the court of appeals decision ordering a new trial only on the question of damages. We reverse that por-

tion of the court of appeals decision directing a new trial on the question of liability.

*By the Court.*—Decision affirmed in part, reversed in part; cause remanded for a new trial on damages only.